IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BILL SHUCK and BRAD SHORE, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>WICHITA HOCKEY, INC. d/b/a WICHITA )<br>THUNDER, HORN CHEN, ICE HOCKEY LLC )<br>d/b/a INDIANAPOLIS ICE, EXPRESS )<br>SPORTS LLC, MEMPHIS HOCKEY, INC., )<br>TULSA OILERS, and CENTRAL HOCKEY )<br>LEAGUE, INC., )<br>)<br>Defendants. )<br>_____) | Civil Action No. 03-1381-JTM |

**PLAINTIFFS' PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW ON THE REMAINING ISSUES FOR THE
COURT**

COMES NOW the Plaintiffs and submit the following proposed findings of fact and conclusions of law that are **in addition to those previously stipulated to** by the parties in the Pretrial Order.

*The Plan Administrator of the Nippon plan*

1.  Central Hockey League is a joint venture that included Wichita Hockey, Inc., Ice Hockey, LLC, Memphis Hockey, Inc. and Central Hockey League, Inc.

2.  The Plan Administrator of the Nippon health insurance plan offered to Wichita Thunder employees during Plaintiffs' employment was identified in the health insurance policy as Central Hockey League. (Ex 23, p. 77 )

1

3.      Central Hockey League was also identified in the Plan as the Employer.

4.      Defendant Central Hockey League, Inc performed the Plan Administrator duties during most of Plaintiffs' employment. The person who performed Plan Administrator duties for Central Hockey League, Inc. was Charlene Smoll.

5.      At some point during the summer of 2002, all of the assets of Central Hockey League, Inc were depleted and all of its employees were laid off.

6.      The Nippon health insurance plan issued a Rider to employees in August 2002, months after the corporation was depleted, that identified Central Hockey League as the Planholder. (EX 23, p.1)

7.      After the staff of Central Hockey League, Inc was laid off, Horn Chen personally assigned the Plan Administrator duties for teams he owned to Dennis Gheen, who was an employee of Ice Hockey, LLC.

*Horn Chen's relationship with Central Hockey League, Inc.*

8.      During 2002, Defendant Chen was the owner of all of the entities who were members of the joint venture known as Central Hockey League.

9.      Defendant Chen was the sole director and sole shareholder of Central Hockey League, Inc.

10.     Central Hockey League, Inc. was incorporated in Oklahoma in 1992. Its initial purpose was to manage the hockey league. Its income was derived from dues paid by different teams in the league.

11.     In the early days of the hockey league, Horn Chen, who owned the teams that made up the Central Hockey League, had a rule that teams that had an excess of $50,000 in their bank accounts were to send their excess funds to Central Hockey League, Inc.

12.     When Central Hockey League, Inc. received money from teams that were profitable, it re-distributed that money to other teams in the league that Chen owned that needed a cash infusion. It also sent money to Chen personally.

13.     After the Central Hockey League merged with the Western Professional Hockey League in 2000, many of the administrative duties that had been performed by Central Hockey League, Inc. were transferred to the new league offices in Phoenix.

14. For a few years, Central Hockey League, Inc continued in existence and handled insurance and other administrative matters for hockey teams owned by Horn Chen.

15. In the summer of 2002, Chen laid off the last of the Central Hockey League employees.

16. The remaining assets of Central Hockey League Inc–some desks and computers–were given to other hockey teams owned by Chen.

17. The Central Hockey League, Inc bank account was closed and its contents were given to Chen.

18. Central Hockey League, Inc's corporate records, books and minutes consist of its bylaws and a few years' worth of waivers of annual meetings. There are no minutes or other records.

19. Though Central Hockey League has bylaws, Chen has not reviewed the bylaws to insure he has complied with them.

20. The Central Hockey League bylaws provide that an annual meeting of stockholders will be held the first Monday in May of each year at 9 a.m. (Ex 20, p.1) The Central Hockey League bylaws provide that at any meeting of the directors three shall constitute a quorum. (Ex 20, p. 6) The bylaws of Central Hockey League Inc provide that the corporation will have a president, vice-president, secretary and a treasurer. (Ex 20, p. 8) The bylaws of Central Hockey League Inc provide that "all funds of the corporation not otherwise employed shall be deposited from time to time to the credit of the corporation in such banks, trust companies or other depositories as the directors may select." (Ex 20, p. 10) Central Hockey League Inc did not comply with any of these bylaws.

21. Though defendant Chen admitted that he was issued a deposition notice to bring financial records and tax returns of Central Hockey League, Inc to his deposition, none were produced and none were produced at trial.

22. Defendant Chen personally paid for Central Hockey League's defense of this matter and personally paid for the attorney who drew up the corporate records for all of his corporations and for the accountant for all of his corporations.

23. Defendant Chen allowed Central Hockey League, Inc to be seriously undercapitalized at a time it was performing Plan Administrator duties because he depleted its assets. After the case was filed, he allowed Central Hockey League, Inc to go into default in Indiana. ( Ex. 12)

24. Defendant Chen could not remember what offices he held in Central Hockey League,

Inc. or his other corporations.

25. Central Hockey League, Inc. did not pay dividends.

26. Defendant Chen did not comply with corporate formalities in his dealings with Central Hockey League, Inc. and did not maintain corporate records.

27. Central Hockey League, Inc and Ice Hockey LLC both received mail at 1202 E. 38th Street, Indianapolis, Indiana.

*Horn Chen's relationship with Ice Hockey, LLC*

28. Chen testified that he did not own Ice Hockey, LLC, but that his four children did as the CBCK Partnership. He testified that the children purchased Ice Hockey, LLC with a loan from him. There was no documentation of the loan or the purchase.

30. Chen personally ordered Dennis Gheen, an Ice Hockey, LLC employee to perform Plan Administrator duties after he liquidated Central Hockey League, Inc. Gheen absorbed this duty for all of Chen's teams without any increase in his salary, which was paid by Ice Hockey, LLC.

31. The assets of Ice Hockey, LLC were sold in April, 2004 while the temporary injunction was in effect against Ice Hockey LLC and while this suit was pending. Chen did not disclose this lawsuit or the injunction to the asset buyers, and, in fact, warranted that there were no claims pending against Ice Hockey, LLC. (Ex 18)

32. Chen's lawyer assisted in drafting of the Asset Purchase Agreement that memorialized the sale of all of the assets of Ice Hockey, LLC.

33. In the sale of the assets of Ice Hockey LLC, Horn Chen signed as a Member of Ice Hockey, LLC. Chen received cash from that sale. The purchase price of the assets was $600,000. (Ex 18)

34. There are no corporate records at all for Ice Hockey, LLC. (Ex 19)

35. Chen is an owner/member of Ice Hockey, LLC. He disregarded corporate formalities for Ice Hockey, LLC. He undercapitalized Ice Hockey, LLC.

36. At a time when Chen knew that Ice Hockey LLC had a claim pending against it and an injunction against it, he sold its only assets and pocketed the proceeds to the detriment of Ice Hockey LLC's potential creditors.

37.     There was no evidence that Ice Hockey LLC had shareholder meetings, elected officers, had bylaws, filed annual reports, filed tax returns or kept financial records separately from defendant Chen.

38.     Chen was not a credible witness.  He admitted that he had filed an affidavit in the hearing on the temporary injunction claiming that he had fired Shuck for gross misconduct–for stealing.  At the same time, he also admitted that he had never told Shuck that he was firing him for stealing, that at the time he fired him, Chen told Shuck he wished that he could keep him on, that he told Shuck that he was only letting him go because he had a plan to sell the team, that he tried to find Shuck another job either in his organization or with some friends of his, that he thought Shuck "would be great" in a similar position, and that he thought Shuck was honest and a good employee and friend.

39.     Chen also denied that there was an entity known as Chen Sports, though his sports businesses operated under that name.

40.     Chen demonstrated disregard for the case and the mistake made by the Plan Administrator by failing to answer discovery until motions to compel were filed, failing to pay sanctions ordered by the court, failing to appear at trial until the second day of trial, failing to disclose the pendency of this claim when he sold the assets of Ice Hockey, LLC, cancelling his deposition five times, and filing a false or misleading affidavit in the temporary injunction hearing.

41.      There is no evidence that Chen's teams have taken any steps to remedy the mistakes made in this case or that anyone performed any audit of the sending of COBRA notices to other former employees.

42.     Despite the lack of credible defense to Plaintiffs' claims, Ice Hockey LLC and Central Hockey League, Inc have refused to concede liability.

*Defendant Shuck*
43.     Plaintiff Shuck is the former general manager of Defendant Wichita Thunder.  On November 4, 2002, Plaintiff Shuck was informed that his employment with Wichita Thunder and Chen would be terminated immediately, though he would be paid through December, 2002.

44.     A qualifying event within the meaning 29 U.S.C.S. §1163(2) occurred on November 4, 2002.

45.     Shuck's employer was required to give notice to the Plan Administrator of the qualifying event within 30 days.  Defendants have admitted that this notice was given by Wichita Hockey Inc.

46.     When Plaintiff Shuck was terminated, he did not receive any notice of his rights to

5

continued health benefit coverage pursuant to COBRA.

47.     After Plaintiff Shuck's termination, he continued to receive health insurance coverage at his employer's expense under the group health plan until May, 2003, at which point he was notified by a telephone call that all health coverage expired.

48.     When his health coverage ended, Plaintiff Shuck did not receive written notice of rights to continued coverage pursuant to COBRA.

49.     Defendants were notified on August 26, 2003 that they had failed to give Shuck the required notice. (Ex 8)

50.     On September 2, 2003, Defendants' lawyers sent Plaintiff Shuck's lawyers a letter which stated "He can purchase the same group coverage with Preferred Health for $219.46 per month. Let me know if he wishes to have coverage and the company will arrange it. Coverage would be available for 18 months." (Ex 9)

51.     On or about October 17, 2003, Plaintiff Shuck entered Wesley Medical Center in Wichita, Kansas and was admitted, diagnosed, and treated for acute myocardial infarction.

52.     Plaintiff Shuck incurred uninsured medical expenses of $105, 711.16 prior to the award of his temporary injunction.

53.     Defendants' letter of September 2, 2003 was not an effective notification of continuation of coverage because it did not contain the information required. From the date of the termination of Plaintiff Shuck's employment and of health coverage continuing to the date of the issuance of the Preliminary Injunction, Plaintiff Shuck did not receive opportunity to elect continued coverage under the group health plan in violation of COBRA, 29 U.S.C.S. § 1166(a).

54.     Despite the inadequacy of the notice contained in the September 2, 2003 letter, Plaintiff Shuck attempted to accept the offer of continuation coverage and elect coverage before the expiration of 60 days in a letter dated October 31, 2003 . (Ex. 21)  In response, defendants denied that the September 2, 2003 was a notice of continuation coverage. (Ex 22)

*Plaintiff Shore*

55.     Plaintiff Shore was an employee of Wichita Hockey, Inc.

56.     On November 5, 2002, Plaintiff Shore was informed that his employment with Wichita Thunder would be terminated immediately.

57.     A qualifying event within the meaning of 29 U.S.C.S. §1163(2) occurred on November

5, 2002.

58.	Plaintiff Shore's employer, Wichita Hockey, Inc. had an obligation to notify the Plan Administrator of Shore's qualifying event within 30 days and it did so.

59.	The Plan Administrator did not send notice of Shore's right to continuation coverage within 14 days of its notice of the qualifying event. Had it done so, it would have notified Shore of his right to continuation coverage on December 19, 2002.

60.	Plaintiff Shore did not receive timely notification of his right to continued coverage, although, after several telephone calls to Defendants, in late January Plaintiff Shore did eventually receive a one page notice.

61.	The one page notice that Shore received was untimely and was not adequate notice of his right to continuation coverage.

62.	Shore did not elect continuation coverage because he thought he was going to have insurance at his new job.

63.	Defendant Chen has at various times claimed that Ice Hockey LLC was the Plan Administrator and responsible for the late notification, (See Answers to First, Second and Third Amended Petition where Defendant claims Ice Hockey LLC is the Plan Administrator.), but now maintains that the defunct Central Hockey League, Inc. was responsible. (See Docket 81, p.6)

## II.	Conclusions of Law

1.	Defendants Central Hockey League, Inc and Ice Hockey LLC and Memphis Hockey LLC are all members of the joint venture known as Central Hockey League and all are jointly and severally responsible for the Plan Administrator duties of that entity.

2.	Defendants Central Hockey League Inc and Ice Hockey LLC both handled Plan Administrator duties and are liable for the failure of the Plan Administrator to timely issue notice of Plaintiffs' rights to continuation coverage. Defendant Central Hockey League Inc was identified as the Plan Administrator on the policy and Ice Hockey LLC assumed and performed the Plan Administrator duties for Central Hockey League Inc.

3.	The Plan Administrator failed to timely provide Plaintiffs Shore and Shuck opportunity to elect continued coverage under the group health plan in violation of COBRA, 29 U.S.C.S. § 1166(a).

4. Defendants' estoppel argument as to Plaintiff Shuck, that its September 2 letter had to have been accepted before Shuck had his heart attack or he would be estopped from exercising his rights under COBRA is frivolous and without merit. In fact, barring Shuck's claim because he did not elect the continuation coverage allegedly offered by Defendants' counsel in the September 2, 2003 letter would deprive Shuck of one of his most important rights under §1165(1)(C)(ii)–the right to have 60 days after notice to decide whether to elect to accept continuation coverage.

5. Within 60 days of the letter of September 2, 2003, Plaintiff Shuck's lawyer attempted by letter to elect coverage and that election was refused. Defendants' refusal specifically stated that the September 2 letter was NOT a COBRA notice. If the court did not allow Shuck 60 days in which to elect coverage, it would deprive him of his COBRA rights.

6. Defendants' position as to Plaintiff Shuck is indefensible.

7. Plaintiff Shore should have been mailed his notice of his right to continuation coverage within 14 days of his employer's notifying the plan administrator of his termination. If the Plan Administrator had complied with the statute, Shore would have been mailed notification by December 19, 2002.

8. Defendants position as to the timeliness of Shore's notification is indefensible.

9. Plaintiffs are awarded the reasonable attorney's fees pursuant to 29 U.S.C.S. §1132(g) because they were forced to bring this action to force Defendants to take responsibility for their failure to give timely notice of Plainitiffs' right to continuation coverage under COBRA. In making this decision, the court has considered (1) the degree of Defendants' bad faith or culpability; (2) the ability of the Defendants to satisfy an award of attorney fees; (3) the deterrence value of an award of attorney fees; (4) whether the parties requesting fees sought to benefit all plan participants or to resolve a significant legal question regarding COBRA/ERISA; and (5) the relative merits of the parties' positions.

> *Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1386 (10th Cir. 1997) *citing Gordon v. United States Steel Corp.*, 724 F.2d 106, 109 (10th Cir. 1983); *Thorpe v. Retirement Plan of Pillsbury Co.*, 80 F.3d 439, 445 (10th Cir. 1996). The court finds that these factors weigh in favor of the Plaintiffs and that Defendants legal positions here are indefensible.

10. Defendants' dilatory responses to Shore's requests, their inattentiveness to matters during this litigation, defendant Horn's filing of a misleading affidavit in the evidentiary hearing at the preliminary injunction, the lack of any evidence that Defendants have attempted to ensure that this does not happen again, the Defendants' pursuit of the frivolous estoppel defense, their refusal to offer a proper notice of right to continuation coverage even after their counsel was notified of the oversight, their refusal to acknowledge Plaintiff Shuck's acceptance of their offer of continuation coverage, even though it was timely made within 60 days after the inadequate offer of coverage–all are evidence of their bad faith and of the necessity of a deterrent.

11. In fact, it was not until Plaintiff Shuck sought and obtained a Preliminary Injunction that Defendants provided him with the "continuation coverage" he was owed. Defendants had every opportunity to correct their failure to provide proper notice and they repeatedly chose not to do so.

12. The preliminary injunction was entered eleven months ago in December, 2002. Defendants have continued to contest their obligations to Shuck, despite the lack of any factual or legal defense. In the meantime, Defendants Chen has sold all of Ice Hockey LLC's assets, leaving Shuck to be subjected to collection agents, late fees, and almost a year of over $100,000 of outstanding medical bills. Shuck has been forced to employ attorneys to require Defendants to fulfill their statutory obligations and Defendants should be held responsible for the costs of that. As in *Smith*, the merits and equities in this case weigh in favor of the court awarding attorneys fees because the position of Defendants is "indefensible." *Smith* at 1386.

13.     In addition, Plaintiffs are also entitled to the statutory penalties that they have requested. Shore testified that he had to call repeatedly and even make a long distance call to receive a COBRA notice and it is appropriate to award statutory penalties when an employee must invest his own time and effort to get the notice to which he is legally entitled. *Brown v. Aventis Pharmaceuticals, Inc.,* 31 F.3d 822 (8th Cir. 2003).

14.     The court awards penalties to Shore of $110 a day for 36 days for a total of $3600 even though he did not incur medical expenses. *Jones v. OfficeMax, Inc.*, 1999 U.S.Dist LEXIS 2239 (D. Utah, 1999) (penalties imposed even though employer gave notice as soon as it was notified that it had failed to do so in a timely manner); *Burris v. Five River Carpenter Dist. Council Health and Welfare Fund*, 2004 U.S. Dist. LEXIS 2341 (S.D. Iowa 2004) (penalties appropriate for inconvenience and emotional concern even when no medical loss incurred because of lack of notice.)

15.     Given the financial and emotional burden Defendants' nonchalance caused Plaintiff Shuck, especially after his heart attack, he is entitled to 29 U.S.C.S. §1132(c)(1)(A) penalties in the amount of $39,160, which is $110 a day from December 16, 2002 ( 44 days after November 4, 2002) through the date of the Preliminary Injunction December 8, 2003–380 days X $110 per day= $39,160.

16.     Plaintiff Shuck is also entitled to be reimbursed for his medical expenses of $105,711.16 and to prejudgment interest on that amount from November 2003, the time those expenses were incurred, until the date of this order.  Though defendants could have asked that his deductibles and premiums he would have paid between May and November 2003 be deducted from his award, they did not and that issue has been waived.

17.     Both federal and state law allow the piercing of the corporate veil when an individual undercapitalizes, fails to observe corporate formalities, is the sole shareholder, director and officer, siphons money from the corporation, fails to maintain corporate records, uses the corporation as a facade for the dominant stockholder, and when the corporation is used to promote fraud or injustice. *NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047 (10th Cir 1993); *State of Kansas v. Marion County Landfill, Inc*., 276 Kan. 328, 76 P.3d 1000 (2003); *Golconda Screw, Inc., v. West Bottoms, Ltd.* 894 P2d 260 (1995).

18.     When corporate legal formalities are not maintained, the court can ignore the corporate existence. *NLRB* 2 F.3d at 1052.

19.     Both Ice Hockey LLC and Central Hockey League Inc failed to maintain adequate corporate records or minutes; both corporation's ownership and control was vested in defendant Chen, Chen depeleted both of all of their corporate assets and left both undercapitalized, Chen used Central Hockey League Inc as a mere shell or instrumentality or conduit even after all of its assets were depleted; while the corporation had assets he used it to fund his other teams and to collect cash for him personally; Chen failed to maintain an arms length relationship between himself and Central Hockey

League Inc because it had no purpose other than to direct funds from each of his corporations to the other corporations, Chen disregarded legal formalities including all corporate documents for Ice Hockey LLC and filing separate tax returns for Central Hockey League, Inc. Finally, because he depleted the assets of both corporations, he diverted both corporations' funds or assets for noncorporate uses.        *NLRB,* 2 F3d at 1052.

20.    Adherence to the corporate fiction would sanction a fraud, promote injustice, or lead to an evasion of legal obligations because allowing Chen to place Central Hockey League, Inc, a corporation with no assets, in the Plan Administrator position where it could incur the kind of liability it has incurred here and then allowing him to claim it has no assets would be inequitable. *NLRB* 2 F3d at 1052. The court finds there is adequate justification to invoke the equitable power of the court. The court finds that to allow Chen to claim he does not own Ice Hockey LLC and to try to hide behind the corporate fiction when he personally assigned to that organization the Plan Administrator duties and then sold all of its assets for $600,000 while on notice of Plaintiffs' claims and while under the temporary injunction would sanction unfairness, injustice or fraud. *NLRB* 2 F3d at 1052.

21.    The court finds that "Deference to corporate entity may be particularly inappropriate in the ERISA context because Congress enacted ERISA in part to protect employees who were being deprived of benefits due to a corporate sham." *Central States Southeast v. Carstensen Freight Lines, Inc*., 1998 U.S. Dist, LEXIS 11265 (N.D. Ill. 1998).

22.    Defendant Ice Hockey LLC had no corporate records, sold its only assets during the pendency of this suit without disclosing the suit, and paid the proceeds of its $600,000 sale to Horn Chen. The court finds that Ice Hockey LLC corporate form should be disregarded because of its failure to operate as a separate entity. The sale of substantially all of a corporation's assets at a time that a claim is pending justifies disregard of the corporate fiction.. *State of Kansas v. Marion County Landfill, Inc*., 276 Kan. 328, 76 P.3d 1000 (2003); *Golconda Screw, Inc. v. West Bottoms Ltd,* 894 P 2d 260 (1995)*; Kilpatrick Bros. Inc. v. Poynter*, 205 Kan 787 (1970)

23.    The directors managers and officers of a corporation who are creditors of an insolvent corporation cannot take advantage of their position to secure preference for themselves over other creditors. *Kirk v. HGP Corp, Inc*. 208 Kan. 777 (1972); *Kilpatrick Bros. Inc. v. Poynter*, 205 Kan 787 (1970)   Chen did this by pocketing the proceeds of the sale of Ice Hockey LLC and by depleting the assets of Central Hockey League, Inc. while still allowing that corporation to assume a Plan Administrator status that could lead to large liability.

24.    When, as here, funds are transferred back and forth between corporations that belong to a dominant shareholder like Chen and the reason for the transfer does not serve the original corporation, that is evidence  that the shareholder regarded all funds as his own and has ignored the corporate fiction. *Kilpatrick Bros. Inc. v. Poynter*, 205 Kan 787 (1970). Chen's transfer of corporate funds in and out of Central Hockey League, Inc. to his other teams at his instruction with no

documentation and no purpose of benefitting Central Hockey League, Inc. is evidence that he regarded the funds that came into Central Hockey League, Inc. as his own.

25. Horn Chen is the alter ego of Central Hockey League Inc and Ice Hockey LLC and those corporate fictions will be disregarded so as to avoid injustice.

26. The court grants judgment to Plaintiff Shore against defendants Central Hockey League Inc, Ice Hockey LLC, Memphis Hockey Inc and Horn Chen for $3600 and his reasonable costs and attorneys fees incurred in pursuing this action. The amount of those fees shall be submitted to the court at a later date.

27. The court grants judgment to Plaintiff Shuck and against defendants Central Hockey League Inc, Ice Hockey LLC, Memphis Hockey Inc and Horn Chen for
- $105, 711.16 in uninsured medical bills and for prejudgment interest from the date those bills were incurred until the date of this order; and
- $39,160 in penalties; and
- Reasonable costs and attorneys fees incurred in pursuing this action. The amount of those fees shall be submitted to the court at a later date.

Respectfully submitted,
HITE, FANNING & HONEYMAN L.L.P.
100 North Broadway, Suite 950
Wichita, KS  67202-3089
Telephone:  (316) 265-7741
Fascmile:    (316) 267-7803
E-mail: tibbets@hitefanning.com
E-mail: hill@hitefanning.com


   /S/ Gaye B. Tibbets
Gaye B. Tibbets # 13240
Scott M. Hill #21166
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December, 2004, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the

following: Alex Mitchell of Klenda, Mitchell, Austerman & Zuercher, L.L.C.

                                                                   /S/ Gaye B. Tibbets